Esperanza Cervantes Anderson | SBN 197953
**LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**
1037 North Allen Avenue
Pasadena, California 91104
Tel.:  (626) 219-6773
Fax:  (626) 389-8911

Attorney for Plaintiff Relator
FRANK ADOMITIS

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. FRANK ADOMITIS, an individual,<br><br>Relator,<br><br>v.<br><br>TAHOE FOREST HOSPITAL DISTRICT; DOES 1 through 20, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT**<br>(31 U.S.C. §§ 3729 et seq.)<br><br>**JURY TRIAL DEMANDED**<br><br>**(FILED IN CAMERA AND UNDER SEAL, AS REQUIRED BY 31 U.S.C. § 3730 (a)(2))** |

## NATURE OF THE ACTION

1.       This is a civil action brought by the United States, as Plaintiff, against Defendants Tahoe Forest Hospital District (the "Hospital") and DOES 1-10 for Medicare fraud involving millions of dollars and both factually and legally false claims, lasting over the course of more than a decade, and continuing at present. This suit seeks damages, civil money penalties, and other relief under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended by the False Claims Act Amendments of 1986, the Fraud Enforcement and Recovery Act of 2009, Pub L.

111-21 ("FERA"), and the Patient Protection and Affordable Care Act of 2010, Pub. L. 111-148. This suit also seeks damages and other relief under the common law theory of unjust enrichment.

2. The FCA was originally enacted during the Civil War to address fraud against the Government. Congress substantially amended the Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating Government fraud, was in need of modernization. Congress intended the amendments to create incentives for individuals with knowledge of fraud against the Government to disclose information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

3. The FCA provides that any person who presents or causes to be presented false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, causes to be made or used false records and statements to induce the United States to pay or prove false and fraudulent claims, is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of damages sustained by the federal Government.

4. The FCA allows any person having information about false or fraudulent claims to bring an action on behalf of the Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the Defendants during that time) to enable the United States to: (a) conduct its own investigation without the Defendants' knowledge, and (b) determine whether to join the action.

5. Based on the FCA, *qui tam* plaintiff and relator Frank Adomitis seeks to recover all available damages, civil penalties, and other relief for the federal violations alleged herein.

## PARTIES

6. Plaintiffs are the United States of America (United States or Government) and the relator, Frank Adomitis. The United States files this Complaint on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), on behalf of the Medicare program.

7. Plaintiff/relator Frank Adomitis ("Relator") is an individual residing in the County of San Bernardino, State of California.

8. Defendant Tahoe Forest Hospital District (the "Hospital") is a 61-bed facility located at 10121 Pine Avenue, POB 759, Truckee, CA 96161. The Hospital is under the Tahoe Forest Healthcare District and has operated from 1950s to the present.

9. Relator is ignorant of the true names and capacities, whether individual, corporate, or associate, of those defendants fictitiously sued as Does 1 through 20 inclusive and so Relator sues them by these fictitious names. Relator is informed and believes that each of the DOE defendants is in some manner responsible for the conduct alleged herein. Upon discovering the true names and capacities of these fictitiously named Defendants, Relator will amend this complaint to show the true names and capacities of these fictitiously named defendants.

10. Unless otherwise alleged in this complaint, Relator is informed, and on the basis of that information and belief alleges, that at all times herein mentioned, each of the remaining codefendants, in doing the things hereinafter alleged, were acting within the course, scope, and under the authority of their agency, employment, or representative capacity, with the consent of her/his/its codefendants.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 31 U.S.C. § 3730. The Complaint is not based upon allegations or transactions that have been publicly disclosed under 31 U.S.C. § 3730(e). In addition, the Relator has direct and independent knowledge of the information on which the allegations and transactions are based and voluntarily provided the information to the Government before filing this action.

12. Personal jurisdiction and venue are proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), as the Defendants are found in, have or have had an agent or agents, have or have had contacts, and transact or have transacted business in this district.

## CRITICAL ACCESS HOSPITAL ("CAH") FRAMEWORK

13. The United States, through HHS and its component agency, CMS, administers the Medicare program, including payments made on a beneficiary's behalf for inpatient and outpatient hospital services provided by a hospital that has entered into an agreement with the Secretary to participate in the Medicare program. Section 1814(1) of the Social Security Act (42 U.S.C. § 1395f(1)) provides for payment of Part A, inpatient CAH services, and Section 1834(g) (42 U.S.C.§ 1395m(g)) provides for payment of Part B, outpatient CAH Services. CMS pays Medicare bills, also called claims, received from hospitals such as the Hospital, and all such claims are paid with federal funds.

14. In 1997, the Balanced Budget Act ("BBA") created the CAH certification to ensure that hospital care is accessible to beneficiaries in rural communities. CAH hospitals are typically small health care organizations with no more than 25 hospital beds that can be used for either inpatient or "swing bed"

services,[1] and are generally located in rural communities with a limited employment and economic base. In the United States there are approximately 1,300 to 1,400 CAHs.

15. CAHs are reimbursed differently by Medicare than other acute care hospitals. CAHs receive federal reimbursement incentives designed to attract hospital providers to communities that would otherwise have difficulty receiving hospital care. Specifically, CAHs receive 101 percent (101%) of Medicare's share of their reasonable and allowable costs for outpatient, inpatient, laboratory, and ambulance services, as well as for "swing bed" services). See 42 C.F.R. §§ 413.70, 413.114. In contrast, traditional hospital facilities are paid under Prospective Payment Systems through which Medicare reimbursement is fixed and capped. Medicare generally pays for the same medical services provided by a CAH as by other acute care hospitals, but CAH payments are based on each CAH's reasonable and allowable costs and the share of those costs allocated to Medicare patients. Thus, as the costs increase, the Medicare reimbursement rates to CAHs also increase and, as these rates increase, so too do the Medicare reimbursements.

16. The Medicare reimbursement rates for CAHs are computed for inpatient services as an average cost per day based on historical data multiplied by 101% and paid on an interim basis. The Medicare reimbursement rates for CAHs are computed for outpatient services by multiplying the billed charge of each claim by the hospital's cost-to-charge ratio and then adding 1 percent (1%) to that amount.

17. Hospitals must meet specific requirements in order to qualify for the CAH certification and receive the favorable Medicare reimbursements described

---

1. "Swing beds" is a reimbursement term that reflects a CAH's ability to use its beds interchangeably for either acute-care or post-acute skilled nursing care. They are designed to offer care to patients who no longer need acute care, but do require additional inpatient services. *See* 42 C.F.R. § 485.620.

Complaint for Damages / Demand For Jury

above. Specifically, hospitals must meet the requirements set forth in the CAH Conditions of Participation (which lay out health, safety, and location-related requirements) to receive the CAH certification.

18. Because the intent of the CAH certification is to ensure access to care in rural communities, CAHs must meet two location-related requirements. 42 USC §1396i-4(c)(2). CAHs *must* be located at least a minimum distance from hospitals (including acute-care, psychiatric, rehabilitation, long-term, and children's hospitals) and other CAHs, and they *must* be located in rural areas.

19. **Distance Requirement.** Hospitals that wish to obtain the CAH certification can meet the distance requirement in one of two ways: (1) by being located more than a 35-mile drive from a hospital or another CAH or (2) by being located more than a 15-mile drive from a hospital or another CAH in areas of mountainous terrain[2] or areas where only secondary roads[3] are available. 42 CFR §485.610(c).

20. **Rural requirement.** Hospitals that wish to obtain the CAH certification can meet the rural requirement by being located either in rural areas or in areas that are treated as rural. 42 CFR §485.610(b). CMS uses a formula based on multiple criteria to determine rural status. Examples of these criteria include whether a CAH is located outside a metropolitan statistical area (MSA), located inside a rural census tract, or located in an area designated as rural by State law or

---

[2] Prior to 2013, CMS defined "mountainous terrain" as areas identified as such on any official maps or other documents published by the State agency responsible for highways in the State (typically a Department of Transportation or Highways) or by USGS. In April 2013, CMS published a uniform definition of "mountainous terrain" which States are to use when certifying hospitals as CAHs. According to this definition, roads that travel through mountainous terrain must be located in a mountain range and meet one of two additional requirements related to ease of travel or effort required to construct the roads.

[3] CMS defines "secondary roads" as roads that are not primary roads. Primary roads include Federal highways (including interstate highways), state highways with two or more lanes in one direction, and roads that—in accordance with U.S. Geological Survey (USGS) standards—are shown on maps as primary highways. Secondary roads typically are one-lane State highways and all other local roads. 42 CFR §485.610(c).

regulation.[4]

21. **Additional CAH requirements.** To be certified as CAHs, facilities must meet additional requirements beyond the location requirements described above. For example, CAHs cannot have more than 25 beds that are used for acute care or "swing-bed" patients (42 CFR §485.620(a)), they must offer 24-hour emergency services (42 CFR §485.618(a)), and they must achieve an annual average length of stay for patients that does not exceed 96 hours. 42 CFR §620(b).

22. **Necessary Provider CAHs.** Prior to January 1, 2006, States had discretion to designate hospitals that did not meet the distance requirement as "necessary provider" (NP) CAHs. NP CAHs had to comply with all of the other CAH Conditions of Participation at the time of their certifications, including the rural requirement.

23. CAHs that were designated NP CAHs prior to January 1, 2006 are permanently exempt from meeting the distance requirement, unless they relocate. Effective January 1, 2006, the Medicare Prescription Drug, Improvement, and Modernization Act prohibited the creation of new NP CAHs, but allowed existing NP CAHs to retain their NP designations indefinitely, as long as they continue to meet all other CAH requirements.

## FRAUDULENT PRACTICES

24. Since July 2008, when it was certified as a CAH, the Hospital has held itself out to be a CAH serving a rural area in Truckee, California, even though it does not qualify as a CAH. First, the Hospital is not designated as an NP CAH by the State of California, and as such was not designated as an NP CAH before January 1, 2006. A phone call with Ms. Jennifer Brooks, the Program Coordinator

---

[4] A metropolitan statistical area (MSA) is an urbanized area with at least 50,000 inhabitants. A rural census tract is a census tract that does not have significant commuting ties to an area with 2,500 or more people. 42 USC §485.610(b).

- 7 -

Complaint for Damages / Demand For Jury

of the Medicare Rural Hospital Flexibility/Critical Access Hospital (FLEX/CAH) Program at (916) 324-7942 confirmed that there are only three necessary providers in the State of California, and the Hospital is not among them.

25. Second, the Hospital does not meet the distance requirements for CAH certification. The nearest hospital is Saint Mary's Regional Medical Center in Nevada. This facility is a large 380-bed non-profit acute care hospital with the latest technology and advanced services, from family care to cardiac surgery. Notably this facility has served the community in Nevada and Truckee for many years, dating all the way back to the turn of the century. With the continuous existence of St. Mary's Regional Medical Center, the ability for Hospital to obtain CAH status for any date in which CMS considered the designation is simply non-existent.

26. According to Google Maps, the most direct route between the two facilities results in a geographic distance between the two hospitals of 33.4 miles. That entire route travels over federal interstate highway 80. Because interstate highways are always defined as primary roads, no part of the route between the Hospital and Saint Mary's Regional Medical Center is a secondary road. See 42 CFR §485.610(c). The lesser distance standard for secondary roads does not apply.

27. Nonetheless, from 2008 to the present, the Hospital has filed cost reports with Medicare for reimbursement for health care services and provided to Medicare beneficiaries using CMC Form 2552, at the rates authorized for CAHs.

28. CMC Form 2552 contains a certification, as follows:

"MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS

REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT" (emphasis in original).

29. Medicare cost reports (CMS Form 2552) presented by CAHs also contain an additional certification, in accord with 42 C.F.R. § 413.24 (f)(4)(iv), entitled "Certification By Officer Or Administrator Of Provider(s)," which states as follows:

"I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations" (emphasis in original).

30. In submitting CMC Form 2552 to Medicare for reimbursement, the Hospital affirmed that the information provided therein (including that it qualified as a CAH) was truthful and honest.

31. Moreover, as a Medicare provider and participant in the Medicare Program, the Hospital was required to enter into agreements with CMS through "Medicare Enrollment Applications" on a form known as a "CMS-855A" wherein the Hospital, through an authorized responsible officer, swore that it "understand(s)

that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with (Medicare) laws, regulations, and program instructions . . . and on the provider's compliance with all applicable conditions of participation in Medicare."

32.  Thus, the representations as to the costs reflected in the Medicare cost reports were presumed by Medicare to be truthful, accurate, and allowable under the applicable Medicare laws and regulations. These representations were and are material to, and indeed (via the certifications listed above) are a condition of Medicare reimbursement.

33.  Medicare relied on the information disclosed in the Medicare cost reports in determining the reimbursement rates and the amounts paid to the Hospital. CMS Form 2552 makes this clear by stating

> "This report is required by law (42 U.S.C. 1395g; 42 CFR 413.20(b)). Failure to report can result in all interim payments made since the beginning of the cost reporting period being deemed overpayments (42 USC 1395g)" (parentheticals in original).

34.  At all times relevant to the allegations in this Complaint, HHS, through CMS, provided Medicare reimbursements for health care services provided to Medicare patients at the Hospital based on the cost reports submitted by the Hospital.

35.  By purposefully filing CMS Form 2552 and therein affirming its purported status as a CAH, the Defendants substantially overcharged, or caused others to overcharge, the Government for inpatient and outpatient services provided to Medicare beneficiaries. As a result of this misrepresentation, the Government overpaid for such services.

36.  Defendants were aware or should have been aware that they did not meet the distance requirements given the absence of evidence to trigger the "mountainous terrain" exception, the presence of primary roads leading to the

Hospital and the Hospital's proximity to St. Mary's Regional Medical Center in Reno, Nevada.

37. Thus, each Medicare cost report (CMS Form 2552) filed by Defendants in the applicable limitations period constitutes a false statement supported a false claim for payment.

## COUNT I
### KNOWINGLY PRESENTING FALSE CLAIMS
### in violation of 31 U.S.C. § 3729(a)(1)(A)
### Claim By and on Behalf of the United States under the False Claims Act
### Against All Defendants

38. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 37 as though fully set forth herein.

39. By virtue of the wrongful acts described herein, from 2008 through the present, Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, presented, or caused to be presented, to Medicare false or fraudulent claims for reimbursement in violation of 31 U.S.C. § 3729(a)(1)(A). In particular, Defendants presented and caused to be presented to Medicare false, fraudulent, misleading, and incomplete information in the Hospital's Medicare cost reports.

40. Medicare relied on these fraudulent cost reports in determining the Medicare reimbursement rates and the amount of reimbursements to be paid to the Hospital, which resulted in the payment of millions more dollars to the Hospital than that to which it was legally entitled.

41. The false representations, records, statements, reports, and certifications described herein were material to Medicare's decision to provide reimbursement to the Hospital and had a natural tendency to influence and did influence those decisions.

42. As a result of the false claims presented, and/or caused to be presented, the United States has suffered actual damages and is entitled to recover

three times the amount by which it has been damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented, or caused to be presented, and other monetary relief as appropriate.

## COUNT II
### USING FALSE RECORDS OR STATEMENTS MATERIAL TO FALSE CLAIMS in violation of 31 U.S.C. § 3729(a)(1)(B)
### Claim By and on Behalf of the United States under the False Claims Act Against All Defendants

43. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 42 as though fully set forth herein.

44. By virtue of the wrongful acts described herein, from 2008 through the present, Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, made, used, and/or caused to be made or used, false records, statements, and certifications material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B). In particular, Defendants made, used, and caused to be made or used, false records, statements, and certifications in the Medicare cost reports of the Hospital.

45. Medicare relied on these fraudulent records, statements, and certifications in determining the Medicare reimbursement rates and the amount of Medicare reimbursements paid to the Hospital, which resulted in the payment of millions more dollars to the Hospital than that to which it was legally entitled.

46. The false representations, records, statements, reports, and certifications described herein were material to Medicare's decision to provide reimbursement to the Hospital and had a natural tendency to influence and did influence those decisions.

47. As a result of these false records, statements, reports, and certifications, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus civil money

penalties of not less than $5,500 and not more than $11,000 for each of the false records, statements, and certifications made to the Medicare program and other monetary relief as appropriate.

## COUNT III
## FAILING TO REFUND OVERPAYMENTS OWED TO THE GOVERNMENT in violation of 31 U.S.C. § 3729(a)(1)(G)
### Claim By and on Behalf of the United States under the False Claims Act Against All Defendants

48.  Plaintiffs re-allege and incorporate by reference paragraphs 1 through 47 as though fully set forth herein.

49.  By virtue of the wrongful acts described herein, from 2008 through the present, Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, received millions of dollars from Medicare to which they were not entitled and which they had an obligation to refund, but Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, failed to return this wrongfully-obtained money to Medicare. Defendants also concealed the false, misleading, and incomplete information included in the Hospital's Medicare cost reports, and never refunded, or offered to refund, any of the money wrongfully obtained. These actions violated 31 U.S.C. § 3729(a)(1)(G).

50.  The false representations, records, statements, reports, and certifications described herein were material to Medicare's decision to provide reimbursement to the Hospital and had a natural tendency to influence and did influence those decisions. In addition, Defendants' concealment of the false and fraudulent expenses impaired Medicare's ability to pursue refunds of the improperly paid amounts.

51.  As a result of these matters, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties of not less than $5,500 and not more than

$11,000 for each of the false claims, and other monetary relief as appropriate.

## COUNT IV
## UNJUST ENRICHMENT
### Claim By and on Behalf of the United States Against All Defendants

52. This is a claim by the United States for unjust enrichment under the common law arising from the Defendants' unjust receipt of Medicare funds while engaged in the illegal conduct described herein. This Court has jurisdiction to adjudicate this claim pursuant to 28 U.S.C. § 1345.

53. The United States re-alleges and incorporates by reference paragraphs 1 through 52 as though fully set forth herein.

54. By virtue of the wrongful acts described herein, from 2008 through the present, Defendants obtained Medicare funds to which they were not entitled.

55. The false representations described herein were material to Medicare's decision to provide reimbursement and had a natural tendency to influence and did influence those decisions.

56. Based on the foregoing, Defendants have been unjustly enriched, and the circumstances dictate that, in equity and good conscience, the money should be returned to the United States.

## PRAYER

WHEREFORE, Relator prays judgment against Hospital and Does 1 through 50, and each of them, as follows:

1. That Defendants cease and desist from violating 31 U.S.C. § 3279 et seq.;

2. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3279 et seq.;

3. That the Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act;

4. That Relator be awarded all costs of this action, including attorneys' fees and expenses;

5. That Relator recover punitive damages from use of Relator's name according to proof; and

6. That Relator recover other and further relief as the court shall deem appropriate.

DATED: __9/7__, 2017.   LAW OFFICE OF ESPERANZA CERVANTES ANDERSON

By: _____
Esperanza Cervantes Anderson, Esq.
Attorney for Plaintiff/relator
FRANK ADOMITIS

# DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules Of Civil Procedure, Relator hereby demands a trial by jury.

DATED: 9|7, 2017

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON

By: *[signature]*

Esperanza Cervantes Anderson, Esq.
Attorney for Plaintiff/relator
FRANK ADOMITIS